# THE UNITED STATES DISTRICT COURT OF THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Linda Huhn; Rob Meyer; and Bruce Anderson, ) ) ) | |
| Plaintiffs, ) | Civil Action No. _____ |
| ) | |
| v. ) | |
| ) | |
| U.S. Citizenship and Immigration Services; and ) U.S. Department of Homeland Security, ) | |
| ) | |
| Defendants. ) ) | |

## COMPLAINT FOR DECLATORY AND INJUNCTIVE RELIEF

### Preliminary Statement

1.     Defendant Department of Homeland Security ("DHS"), acting through its component agency United States Citizenship and Immigration Services ("USCIS"), regulates the entry and settlement of millions of foreign nationals into the United States through its authority to develop and implement visa and citizenship policy.[1] To a very substantial and increasing degree, most American population growth in the past several decades has been caused and continues to be caused by the entry and settlement of foreign nationals as a result of DHS policy. This robust population growth causes significant impacts to the human environment for U.S. citizens. Therefore, the agencies regulating visa and citizenship policy have an ongoing obligation to

---

[1] In 2003, the Secretary of State and the Secretary of Homeland Security signed a Memorandum of Understanding regarding visa policy in implementation of the Homeland Security Act of 2002. Memorandum of Understanding between the Secretary of State and the Secretary of Homeland Security Concerning Implementation of Section 428 of the Homeland Security Act of 2002, https://nationalimmigrationproject.org/PDFs/practitioners/practice_advisories/pr/dos-dhs-mou.pdf

analyze the environmental effects of their actions before implementing them under the National

Environmental Policy Act ("NEPA"). The Nat'l. Env't. Policy Act of 1969, Pub. L. 91-190, 42

U.S.C. 4321-4347 (Jan. 1, 1970). Because USCIS, a subcomponent of DHS, is responsible for

visa and citizenship policy and promulgating visa and citizenship regulations.[2] USCIS (and DHS

as well, because USCIS is a component of DHS) is therefore an agency whose actions have

significant impacts on the environment.

2.      DHS, and USCIS within it, however, have turned a blind eye to the significant

environmental impacts resulting from its major visa and citizenship policy actions. DHS has

never prepared an Environmental Impact Statement ("EIS") or an Environmental Assessment

("EA") in connection with any of its ongoing actions related to visa and citizenship policy. The

agencies' continuing failure to do so stems from a failure of DHS's NEPA procedures which

DHS adopted in 2014.[3] These procedures, which are binding on all of DHS and are used by

USCIS as its guide to determine when and how to apply NEPA, fail to even consider the

potential environmental impacts of USCIS's entire mandate.[4]

3.      DHS's blindness to the environmental impacts of the entry and settlement of foreign

nationals originates from that of its predecessor agency, the Immigration and Naturalization

Service ("INS"). INS was a component agency of the Department of Justice and handled both the

enforcement of immigration laws and the administration of immigration services.  With the

---

[2] Other agencies, such as the Department of State and the Department of Labor, are also involved
in the promulgation of such regulations, but USCIS has final authority over them, including
those which are promulgated jointly with agencies in other departments such as the Department
of State and the Department of Labor.

[3] These procedures can be found on DHS's website at https://www.dhs.gov/publication/directive-
023-01-rev-01-and-instruction-manual-023-01-001-01-rev-01-and-catex. They are attached to
this complaint as Ex. 1 and 2.

formation of DHS, these functions were split into three separate component agencies: (1) USCIS, which handles immigration services as INS did, but has also now been granted some authority over visa policy that previously resided in the Department of State rather than in INS; (2) Immigration and Customs Enforcement, which handles the enforcement of immigration law; and (3) Customs and Border Protection, which handles border security.[5]

4.      The historical blind spot is apparent through an examination of the DOJ's NEPA procedures, which were promulgated in 1981, in response to the Counsel for Environmental Quality (CEQ)'s regulations adopted in 1978.[6] The DOJ had an appendix with NEPA procedures specifically for INS. 46 Fed. Reg. 7,953 (Jan. 26, 1981).  The DOJ appears to have interpreted the guidance from CEQ as  merely establishing a requirement to determine when any of its components might need to build new physical structures in pursuit of its mission. INS states that through its enforcement of the nation's immigration laws, it sometimes needs to "detain aliens believed deportable," and that it would consider the environmental impacts of "efforts associated with the leasing, purchase, design, construction, and maintenance of new and existing INS facilities."[7]

5.      However, the scope of NEPA has never been so narrow as to simply determine when an agency may be involved in the purchase or construction of a physical structure. Rather, the core purpose of NEPA is to ensure that, before a federal agency undertakes a federal action, its decision-makers consider the range of potential environmental impacts the action may have on

---

[5] Information on this history can be found at USCIS's website: https://www.uscis.gov/about-us/our-history
[6] The 1978 regulations were largely unchanged until this year, when CEQ promulgated significantly updated regulations. 85 Fed. Reg. at 43304 (July 16, 2020), 40 C.F.R. § 1500 *et seq*. The new regulations became effective on September 14, 2020. See White House statement on CEQ modernization at https://www.whitehouse.gov/ceq/nepa-modernization/
[7] *Id.*

the "human environment[.]" 42 U.S.C. § 4331(c)(C) (2012).  NEPA, as it was conceived, written and interpreted by the courts, embodies a grander national policy that aims to ensure that decisions affecting the human environment are made with eyes wide open and in full view of the public, so that all stakeholders may understand the implications of federal actions on the natural resources on which we all depend.   The recently updated CEQ regulations state that "NEPA establishes the national environmental policy of the Federal Government to use all practicable means and measures to foster and promote the general welfare, create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 40 C. F. R. § 1500.1 (2020). With respect to visa and citizenship related actions which regulate the entrance and settlement of foreign nationals into the United States, DHS and USCIS are woefully deficient in carrying forth this Congressional obligation.

6.      When DHS was formed as a new agency, it adopted its own NEPA procedures, pursuant to the then current CEQ regulations, which at the time had been largely unchanged since 1978. DHS's procedures were finalized in 2014 with the issuance of DHS Directive 02301, Implementation of the National Environmental Policy Act ("Directive"), attached hereto as Ex. 1 and Instruction Manual 023-01-001-01 ("Instruction Manual"), attached hereto as Ex. 2. Notice of the Final Directive and Instruction Manual was published in the *Federal Register* on November 26, 2014 and became effective on March 26, 2015. 79 Fed. Reg. at 70538. Together, the Directive and the Instruction Manual, which went through public notice and comment, and established legally consequential procedures, constituted final agency action under the Administrative Procedures Act. According to DHS itself:

> Together, the Directive and Instruction apply to all of the Components of DHS and help ensure the integration of environmental considerations into DHS decision making as

required by NEPA. The Instruction serves as the DHS implementing procedures for NEPA (as required by 40 CFR 1505.1 and 1507.3) and includes the Department's list of Categorical Exclusions, found in Appendix A, Table 1.[8]

7.     DHS's adoption of new NEPA procedures for a new agency presented an opportunity to correct INS's decades-long failure to recognize environmental impacts resulting from its population-growth inducing programs—a particularly important task in light of the ever-increasing numbers of foreign nationals settling in the United States and the resulting obvious associated environmental impacts. However, the Instruction Manual continued to perpetuate the INS blind spot regarding the myriad environmental consequences of its actions concerning the entry into and settlement of mass numbers of people into the United States. In the Instruction Manual, DHS arbitrarily and capriciously fails even to recognize or consider whether there are any potential environmental consequences to the entire mandate of one of its component agencies—USCIS. USCIS's sole mission is the regulation of the entry into and settlement of foreign nationals in the United States. Because the programs that USCIS regulates involve the entrance and settlement of millions of foreign nationals, it certainly is a mandate fraught with significant environmental consequences.

8.     The administrative record of the DHS NEPA procedures, attached hereto as Ex. 3, shows that DHS never considered whether the mandate of USCIS results in any environmental impacts. DHS' NEPA procedures are the only NEPA procedures available for USCIS to use. While some subcomponents of DHS have individual NEPA procedures, which must be approved by DHS, USCIS does not have its own NEPA procedures. Nor do any of DHS' main NEPA procedures applicable to all its other components provide any reasoned guidance related to USCIS' mandate.

---

[8] DHS homepage at https://www.dhs.gov/administrative-revisions-dhs-instruction-023-01-001-01-rev-01, last accessed on November 16, 2020.

The failure of DHS and USCIS to develop a NEPA framework for these actions means that DHS and USCIS continue to fail to undertake any environmental analysis whatsoever when adopting major actions regarding visa and citizenship related actions, or other actions regarding the entry and settlement of foreign nationals into the United States.

9.     DHS's NEPA procedures also fail to any express categorical exclusions relating to entry and settlement of foreign nationals. None of the categorical exclusions on DHS's list adopted in Appendix A of the Instruction Manual relate in any way to USCIS's mandate of visa and citizenship related activities. Further, the administrative record of the Categorical Exclusion shows that no contemplation of visa and citizenship related activities were considered in the adoption of any of DHS's categorical exclusions. See Ex. 2 at A-1-A-30 and Ex. 3. It is arbitrary and capricious for DHS never to have given any consideration to USCIS's  actions. Given that USCIS' mandate, visa and citizenship related actions, does have profound environmental consequences, this failure amounts to a continuing violation of NEPA.

10.     The CEQ has recently promulgated a substantive overhaul of its 1978 regulations directing and providing guidance to all Federal agencies, including DHS, on their adoption of new NEPA procedures. This new regulation became effective on September 14, 2020. *See* 85 Fed. Reg. at 43304-43376 (July 16, 2020). The new regulations mandate that all Federal agencies, including DHS, adopt new NEPA procedures within one year of the regulation's effective date. DHS should be enjoined from promulgating new procedures without considering the adoption of component procedures for USCIS that ensure that DHS complies with its statutory obligations regarding its actions regulating the entrance and settlement of foreign nationals.

11.     In order to establish the scope and magnitude of the environmental impacts at issue, Plaintiffs have undertaken extensive research and retained experts[9] to:

(a) identify and delineate the profound growth of the population of the United States as a result of the entrance and settlement in the United States of multitudinous foreign nationals;

(b) identify and delineate environmental impacts to Plaintiffs resulting from this immigration-induced population growth; and

(c) specifically identify numerous major actions that escaped NEPA review as a result of DHS's—and previously, INS's—promulgation of NEPA procedures that are arbitrary and capricious.

12.     Plaintiffs seek to compel DHS and USCIS to properly comply with NEPA in connection with its programs that regulate the entry into and settlement of foreign nationals in the United States. Plaintiffs seek both a declaration from this Court that DHS is violating NEPA and an injunction to require DHS to comply with the law. Further, Plaintiffs assert that, in the course of approving its agency actions implementing its programs regulating the entry into and settlement of foreign nationals in the United States, DHS has continually violated its fundamental obligation to engage in well-reasoned, non-arbitrary decision-making under the Administrative Procedure Act, ("APA"). *See* 5 U.S.C. § 701 *et seq*. (2012).

---

[9] Plaintiffs have retained three experts for this action. First, Jessica Vaughan, an expert on United States immigration law, policy, and practice, has analyzed DHS's (and legacy INS's) visa and citizenship related actions and their impacts on the United States population. Her affidavit regarding these actions is attached hereto as Ex. 4. Second, Steven Camarota, Ph.D., an expert on the demographic impacts of immigration, produced an expert report addressing the impact of immigration on population growth. His report is attached hereto as Ex. 5. Third, Philip Cafaro, Ph.D., a sustainability expert, produced a report on the environmental impacts of population growth. His report is attached hereto as Ex. 6.

13.     Plaintiffs' Count I asserts that the NEPA procedures DHS adopted in 2014 are arbitrary and capricious, in violation of the APA and NEPA. Plaintiffs ask the Court to order the Defendants to promulgate new procedures that incorporate analysis of the environmental effects of USCIS' mandate. Plaintiffs' Count II lists specific, ongoing actions that Plaintiffs assert DHS/INS implemented in violation of its NEPA obligations and continue to maintain and update without NEPA analysis.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 5 U.S.C. § 706 (APA), and 28 U.S.C. § 1361 (mandamus).  Plaintiffs also seek declaratory and injunctive judgment and further relief pursuant to 28 U.S.C. § 2202.

15.     Venue in this judicial district is proper under 28 U.S.C. § 1391(e) because this is an action against an agency of the United States.

## RELEVANT STATUTES

### A.     THE NATIONAL ENVIRONMENTAL POLICY ACT

16.     NEPA was the first major environmental law of the United States, and it has often been called the "Magna Carta" of the nation's environmental laws. NEPA expressly recognizes Congressional concern for "the profound influences of population growth" on "the natural environment[.]" 42 U.S.C. § 4331(a). Through NEPA, Congress directs, in relevant part, that the Federal Government shall:

> use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—
> (1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;
> (2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3)  attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;
(4)  preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible an environment which supports diversity and variety of individual choice;
(5)  *achieve a balance between population and resource use* which will permit high standards of living and a wide sharing of life's amenities . . . .

42 U.S.C. § 4331(b) (emphasis added).

17.     To accomplish its goals, NEPA requires each federal agency to identify and consider the environmental impacts of its proposed federal actions. *See generally* 42 U.S.C. § 4331. Each agency must also consider alternatives and mitigating measures which could avoid or reduce such impacts before implementing federal agency actions that may significantly affect the environment. To these ends, NEPA establishes, in relevant part:

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws shall be interpreted and administered in accordance with the policies set forth in this Act, and (2) all agencies of the Federal Government shall--
. . .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
         (i) the environmental impacts of the proposed action,
         (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
         (iii) alternatives to the proposed action, . . . and
         (v) any irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332.

18.     NEPA is designed to inject environmental considerations early into a Federal agency's decision-making process in order to "ensure that agencies consider environmental impactions in their planning and decisions." 40 C.F.R. § 1501.2 (a). NEPA is also designed to engage the public. "NEPA promotes its sweeping commitment to 'prevent or eliminate damage to the environment and biosphere' by focusing government and public attention on the environmental

effects of proposed agency action." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989). *See* 40 C.F.R. § 1500.1(b); see also §§ 1503.1(a)(2)(v) (Inviting comments and requesting information and analyses), and §1506.6 (public involvement) (2020). Because public involvement is paramount in the NEPA process, each agency shall "[p]rovide public notice of NEPA-related hearings, public meetings, and other opportunities to comment, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected by their proposed actions." 40 C.F.R. § 1506.6(b). NEPA thus is, at the very least, an environmental disclosure and public participation tool.

19.     NEPA established the White House Council on Environmental Quality ("CEQ"), which issues regulations guiding agencies' compliance with NEPA. See 42 U.S.C. § 4341 et seq. (2012); 40 C.F.R. § 1500 (2020). CEQ regulations define what constitutes agency action and set forth the process for determining whether an action or program significantly affects the quality of the human environment. "Major federal actions" are defined to include "new and continuing activities including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; [and] new or revised agency rules, regulations, plans, policies, or procedures . . . ." 40 C.F.R. § 1508.1 (q)(2)(2020).

20.     At the time that DHS promulgated its current NEPA procedures, CEQ's regulations provided that each federal agency shall adopt procedures to ensure that its "decisions are made in accordance with [NEPA's] policies and procedures . . . ." 40 C.F.R. § 1505.1 (1978) (archived). An agency must specifically ensure that its NEPA procedures provide for designating the major decision points for the agency's principal programs likely to have a significant effect on the human environment and assuring that the NEPA process corresponds with them. *Id*. The CEQ regulations at the time also explicitly recognized that human population growth is an effect

subject to NEPA analysis. 40 C.F.R. § 1508.8(b) (1978, archived) provided, in relevant part:

"Indirect effects may include growth inducing effects and other effects related to induced

changes in the pattern of land use, population density or growth rate, and related effects on air

and water and other natural systems, including ecosystems."

21.     DHS never took into account any of these effects.

22.     Pursuant to NEPA and the CEQ regulations, after a public notice and comment period

and approval from the CEQ, DHS published its NEPA procedures on November 26, 2014. *See*

Ex. 2. The Instruction Manual "serves as the DHS implementing procedures for NEPA (as

required by 40 C.F.R. §§ 1505.1 and 1507.3) which supplement the CEQ regulations and

therefore must be read in conjunction with them." *Id*. at III-1. The Instruction Manual states that

NEPA applies to a wide range of DHS activities:

> Generally, NEPA applies to Federal actions that affect the human environment. Within
> DHS, NEPA generally applies to actions to be undertaken, funded, permitted or
> otherwise approved by DHS[,] including activities that may be wholly initiated within
> DHS, executed by DHS under the direction of Congress, or proposed by persons or
> organizations outside of DHS that require approval funding, a license, or a permit from
> DHS. *Id*.

23.     Pursuant to 42 U.S.C. § 4332(C), each agency is required to prepare an "Environmental

Impact Statement" ("EIS") for each "major federal action[] significantly affecting the quality of

the human environment . . . ."

24.     CEQ regulations provide for the preparation of a document known as an Environmental

Assessment ("EA") to enable an agency to determine whether a particular action may have a

significant impact on the quality of the human environment and thus require preparation of an

EIS. 40 C.F.R. § 1501.5 (2020).

25.     An EA or EIS must also discuss and analyze alternatives to a proposed program or

project—including a "no-action" alternative, which may have less environmental impact than the

proposed action, as well as mitigation measures in relation to potential environmental impacts. See 40 C.F.R. §§ 1502.14, 1502.16.

26.     CEQ regulations provide that "agencies shall evaluate in a single environmental impact statement proposals or parts of proposals that are related to each other closely enough to be, in effect, a single course of action." 40 C.F.R. § 1502.4(a).  An adoption of a new agency program is an action for which an EIS may be prepared. 40 C.F.R. § 1502.4(b). When preparing EISs on programmatic actions, agencies may evaluate if actions have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter. 40 C.F.R. § 1502.4 (b)(ii).

27.     At the time when DHS promulgated its NEPA procedures, and adopted its visa and citizenship related actions, CEQ's regulations specifically gave guidance that, in preparing an EA or EIS, an agency must consider direct, indirect, and cumulative effects. See 40 C.F.R. §§ 1502.16, 1508.8, 1508.9, 1508.27 (1978 archived). Under the regulations in force when DHS carried out all of the actions at issue in this case, "effects" and "impacts" are synonymous and include:

> ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects . . . .

> 40 C.F.R. § 1508.8(b) (1978 archive).

28.     Both the 1978 and the current CEQ regulations authorize agencies to exempt certain agency actions from environmental review through the use of "categorical exclusions," which are "categories of actions that normally do not have a significant effect on the human environment, and therefore do not require preparation of an environmental assessment or environmental impact statement." 40 C.F.R. § 1508.4 (2020).

29.     For those federal actions that are not categorically excluded and are, following

completion of an EA, determined not to have "a significant impact on the human environment"

and thus do not require preparation of an EIS, the agency issues a "finding of no significant

impact" ("FONSI"). 40 C.F.R. § 1501.6. (2020).

**B.      THE ADMINISTRATIVE PROCEDURE ACT**

30.     The APA provides for judicial review of federal agency actions. See 5 U.S.C. § 701 *et*

*seq*. Under the APA, a reviewing court must "hold unlawful and set aside agency action,

findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law[.]" 5 U.S.C. § 706(2)(A) (2012). Accordingly, a federal agency must

take a hard look at the consequences of its actions. It must examine the relevant data and

articulate a satisfactory explanation for its action, including "a rational connection between the

facts found and the choice made*." Motor Vehicle Mfrs. Ass'n of the U.S. Inc. v. State Farm Mut.*

*Auto. Ins. Co*., 463 U.S. 29, 43 (1983). An agency must explain in an explicit and rational

manner how its decision is based upon and complies with the relevant factors specified in the

controlling statutory provision(s), together with applicable agency regulations. See *id*. at 42-43.

A reviewing court may set aside, as arbitrary and capricious, agency factual findings and

conclusions found to be unsupported by substantial record evidence. 5 U.S.C. § 706(2).

**PARTIES**

**A.  PLAINTIFFS**

31.     Linda Huhn is a citizen of Minnesota. Ms. Huhn's declaration is attached hereto as Ex. 7.

She was born in Minnesota, and has lived in the state for 72 years, most of her life. (Dec. ¶1)

She now resides in Minneapolis. Ms. Huhn has been involved in environmental activism for

decades. She has been a longtime member of Zero Population Growth, the Minnesota Public

Interest Research Group (founded by activist Ralph Nader), and The Nature Conservancy. She also participates in volunteer work trips to rehabilitate state parks and wildlife habitats. A graduate of Mankato State College, she is a professional event and nature photographer. In her photography business, she focused much of her work on stock for calendars and other publications.  (Dec. ¶5)

32.     As a resident of Minneapolis, she has seen the impact that immigration policy, particularly the refugee program, has had on population growth in her area. This population growth has led to environmental impacts that specifically affect her.  (Dec. ¶7)  One of her favorite subjects to photograph, the endangered Karner Blue Butterfly, now no longer exists in Minnesota, disappearing because road development wiped out the Butterfly's main food source. Ms. Huhn now "ha[s] to travel outside the state to see and photograph it, rendering [her] photographs less profitable."  (Dec. ¶10)  Another local photographic subject she was once able to use was of the "native wildflowers on virgin prairie remnants near historic Fort Snelling."  But this area was bulldozed for light rail construction for the airport, rendering her photography impossible, "spell[ing] lost income and enjoyment."  (Dec. ¶10)  The light rail's construction was due to the need to accommodate the new population brought to Minneapolis by immigration. Ms. Huhn's losses also include her aesthetic enjoyment of the nature which used to surround Minneapolis which has been lost. She has frequently driven from Minneapolis to her childhood home of New Ulm. Over the years, she found:

> the trip grew longer as the Minneapolis urban area sprawled farther west. Instead of two hours, by the mid 1990's the 100-mile trip had stretched to nearly three.  It was also less scenic… Construction of office buildings atop a hill overlooking the Minnesota River outside a western suburb I passed through meant destruction of about half the hill prairie I had always eyed for seasonal wildflowers. (Dec. ¶9)

Other favorite and memories from the grounds of her childhood home were the frequent sounds of frogs and the Eastern Meadow Lark—which are seldom seen or heard in the area now. She

used to love watching and photographing wild birds: "Northern Flickers, Chickadees, Northern Cardinals, Robins, and Blue Jays used to be everywhere.  The Red-Headed woodpecker was also a common sight." (Dec. ¶3)   However, population growth has taken its toll on her enjoyment of this avian biodiversity: "recent news articles report [the red-headed woodpecker's population is down] by 95% in Minnesota because of loss of oak savanna habitat, of which we now have less than 1% of the original."  This decline was directly related to increased development and population growth.  She grieves over the decades of her life spent slowly watching the gradual loss of the wilderness she grew up enjoying and that marked her childhood so profoundly. This loss was driven by government choice, but Ms. Huhn never had the chance to make her voice heard on any of it because of DHS and the former INS' failure to follow NEPA.

33.     Specific conservation projects that are personally valuable to her are endangered by future population growth. The Minnesota Native Plant Society, of which she is a member, lobbied for the creation of the Minnesota Scientific and Natural Areas (SNA) program, which protects lands in Minnesota with exceptional ecology and rare species.  The SNA lands are invaluable to her as a citizen, lover of nature, and nature photographer. However, due population growth driven development, some of these lands are beginning to be encroached upon. Urban sprawl has nearly reached the borders of her personal favorite SNA, the Helen Allison SNA. "Not only does this encroachment impede with [her] enjoyment of the Helen Allison SNA, it also threatens the SNA itself.  For instance, invasive species are often carried by livestock and pets in addition to gardens or waste." (Dec. ¶11)  She has seen horse tracks in the SNA. She worries that much of the legislative and citizen activism in which she has participated will be nullified by invasive plant species taking root.

34.     The green spaces and outdoors locations have also degraded because of population growth: "sharp population growth has led to serious housing shortages.  Tent camps for unsheltered people have been part of daily news for over two years.  Sadly, many of these tent camps are impinging on the ecological integrity of suburban and urban open spaces per the camps' physical footprints or the trash and debris they produce."  (Dec. ¶12)  Aesthetically, functionally, and recreationally, her enjoyment of her own neighborhood has been reduced. She fears that if population in Minnesota continues to increase through immigration, more and more of the open spaces and biodiversity she has enjoyed all her life will continue to be lost.

35.     Rob Meyer has spent most of his career in Minnesota and has lived in the twin cities since 1980.  Mr. Meyer's declaration is attached hereto as Ex. 8. He majored in Economics at Augsburg College in Minnesota and received an MBA in Business Economics from the University of Washington. Throughout his life as an environmental activist, he has belonged to a variety of environmental organizations including the Center for Biological Diversity, Negative Population Growth, The Trust for Public Land, Northeastern Minnesotans for Wilderness, Friends of the Boundary Waters Wilderness, National Resources Defense Council, the Minnesota Land Trust, and others. (Dec. ¶2)

36.     Mr. Meyer's enjoyment and recreation of the nature around him has been hampered by population growth where he lives. The lakeshore cabin his family owns in northwest Wisconsin was once in a wilderness, but now, more and more cabins are being built in the woods, leading to forest fragmentation. As a result, "open spaces ripe for bird and animal watching are evaporating; areas where [he and his family] could camp as children are paved over." (Dec. ¶4) Today, virtually all lakeshore on Minnesota and Wisconsin lakes has been developed—with cabins built right on the roads that circle the lakes. He sees the contrast between the experience

he had as a child connecting with nature and that of his children. His "children are not able to connect with nature nearly as easily or frequently as my generation."  (Dec. ¶4)

37.     Population growth has caused massive suburban development on the east Metro Area of Minneapolis-Saint Paul in the St. Croix River Valley. The "the bare pastureland [Mr. Meyer] drove by on the way to high school in the early 1970's has been replaced by major shopping centers and endless single-family houses interlaced with multistory apartments and townhomes." (Dec. ¶5)  This suburban sprawl around the Twin Cities constantly affects Mr. Meyer personally. When he first moved to [the Twin Cities] in 1980, traffic levels and congestion were greatly less than they are now. He now spends hours in traffic as a direct result of population growth, with his commute to work increasing by 20-30 minutes a day just in the past 12 years. In addition, the population growth has significantly reduced the quality of his recreation opportunities along the rivers and his enjoyment of interstate waterways. The St Croix River, which is a designated National Scenic Riverway, has been always been a special place to Mr. Meyer. Throughout his life, he, along with his family, has frequently boated on the St. Croix, Mississippi River, and Minnesota Rivers. With so much population growth, all three of these rivers are becoming "progressively more crowded" each year "with boats and beach parties" as the local population grows. (Dec. ¶5)   The sand beaches he used to enjoy are particularly crowded.

38.     Furthermore, the years of immigration driven population growth has also necessitated an increase farmland production to meet the growing population's increased demand for food. This increased farmland production means that far more farming-related sediment is washed into streams. This increased sediment in the water personally affects Mr. Meyer when he is boating: it causes lower visibility of potential water-borne hazards, clogs his boat's cooling vents, shallows the waterways, and rapidly forms sandbars, which are very hazardous.  On one occasion, Mr.

Meyer and children were completely grounded on a newly formed sandbar in a section of the Mississippi River known as Lake Pepin, and had to jump into ankle deep water. In his own childhood, before the population growth in the area, that never would have happened.  (Dec. ¶6)

39.    Mr. Meyer is aware of NEPA and how it was designed to promote environmentally-informed decision making and to public participation in federal agencies' actions.  When he learned of it, he realized that the government had a legal duty to let him make his voice heard on the decisions it was making before irrevocably altering the environment he had lived in so much of his life. He wondered why it have never been applied to the refugee programs that have settled so many people in the area he lives and changed without a chance for his voice to be heard. (Dec. ¶¶9-11)

40.    Bruce Anderson is a resident of Chisago City, Minnesota. Mr. Anderson's declaration is attached hereto as Ex. 9. When he was in high school, his parents purchased parents purchased 120 acres of forest land and wetlands in north central Minnesota. It was exploring the natural landscapes and wild places on this property that sparked his love of nature that launched his natural resources education and career. He graduated from North Dakota State University in 1977 with a degree in Range Management (Botany Department) with a minor in Wildlife Management. Following graduation, he began a long career with the U.S. Forest Service as a Range Management Specialist and Wildlife Biologist. He began as a range management specialist in the National Grasslands of SE North Dakota, and then continued in the Badlands of Western North Dakota, the Black Hills National Forest (NF) of South Dakota, the Custer NF in South Central Montana, Nez Perce NF in West Central Idaho and finally the Superior NF in Northeast Minnesota. After leaving the Forest Service, he was hired by the Minnesota

Department of Natural Resources and had a four-year career as an Assistant Wildlife Manager in northern Minnesota.  (Dec. ¶3)

41.     As a native Minnesotan, he has always particularly value two natural landscape features: native grasslands and wetlands, particularly prairie wetlands, both of which are under threat from urban sprawl caused by population growth. (Dec. ¶6)

42.     He is an avid a birdwatcher and nature observer, and his enjoyment of these activities has become more and more threatened by urban sprawl and other development caused by population growth encroaching ever further into the wilderness. While observing nature in Minnesota and Wisconsin, over time Mr. Anderson has personally witnessed the dramatic decline of many species he used to find easily.  This includes endangered species such as the Western Fringed Prairie Orchid, the Piping Plover and Black Footed Ferret. He fears that if federal government driven population growth continues or accelerates, these cherished species will disappear altogether.  (Dec. ¶9)

43.     The sprawl not only directly displaces native and rural habitats but has indirect affects to the environment he uses to recreate including increased recreational pressure on adjacent open space, accelerated pollution to watersheds and air sheds. Motorized recreation on public lands that he uses has sharply increased as ever more people crowd into the remaining spaces for their enjoyment of nature. Over the past forty years Mr. Anderson has personally seen the huge proliferation of motorized recreation.  He has been dismayed by the loss of solitude in recreational activities and in nature as the roar of their motors echo through the wilderness; his enjoyment of certain trails interrupted or hazarded because of ATV traffic (places years ago where there no such traffic).  The physical and acoustic footprint of these vehicles negatively impacts big small game and non-game species, which are sensitive excessive noise and

disturbance particularly during the breeding season and throughout the winter. Displacement during winter depletes energy reserves needed for survival and reproduction by mammals and birds. Engine noise scares and disorients animals while physical tracks destroy habitat and food sources.  He has "also witnessed entire landscapes in Minnesota and western states succumb to invasive plant expansion over time." (Dec. ¶ 10)  Invasive plant species, spread and encouraged by human activity in developments, has altered many recreation sites he has enjoyed to the point where conditions were more hazardous for recreation.  Mr. Anderson feels that "the opportunity to experience natural landscapes, wild animals and wild places has drastically diminished during [his] lifetime." (Dec. ¶ 11)  He fears that his "grandkids will have only a fraction of remaining wildlands to enjoy when they are adults."  (Dec. ¶ 11)

## B.    DEFENDANTS

44.    Defendant DHS is a federal agency which was established in 2003, pursuant to the Homeland Security Act passed on November 25, 2002. See Homeland Security Act of 2002, Pub. L. No. 107–296, 116 Stat. 2135 (2002) ("Act"). Pursuant to this grant of authority, DHS is mandated to administer border security, immigration enforcement, naturalization, and establish and administer rules governing the granting of visas or other forms of permission to enter the country. See 116 Stat. at 2178, 2187. By the authority of the Act, DHS took over the functions of government formerly delegated by Congress to the INS, a division since 1940 of the Department of Justice. DHS now carries out the functions of the former INS, that is, the regulation of immigration into the U.S., through three sub-agencies, U.S. Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement ("ICE"), and U.S. Citizenship and Immigration Services ("USCIS"), CBP and ICE took over the law enforcement functions of INS (which are not at issue in this case). USCIS took over the service and benefits functions of INS.

CBP is responsible for inspecting both persons and goods arriving at the border and granting or denying entry to the United States. ICE is responsible for investigating and enforcing violations of the immigration laws within the United States.

45.     Defendant USCIS adjudicates benefits for immigrants and non-immigrants, such as granting and extending visas, green cards, and naturalization, and reviews appeals of visa decisions. As a federal agency, DHS and its component USCIS are subject to NEPA and the APA.

46.     In accordance with NEPA, DHS has adopted NEPA regulations to guide its discretionary agency action decision making. See 42 U.S.C. § 4333 (2016); Ex. 2 (Instruction Manual); Synopsis of Administrative Record to Support Proposed New Categorical Exclusions Under the National Environmental Policy Act, Dept. of Homeland Sec. (Dec. 2014), Ex. 3.

## GENERAL ALLEGATIONS

47.     Visa and citizenship policy, the province of USCIS within DHS, allows the settlement of people into the United States in large numbers. People inevitably interact with the environment, and, today, environmental scientists are well able to measure these effects. NEPA accordingly requires DHS to consider the environmental effects of USCIS's visa and citizenship policy related actions.

48.     DHS/USCIS has failed and continues to fail to analyze the environmental impacts of its policy actions that have allowed and continue to allow millions of foreign nationals to enter into and settle in the United States. These actions result in significant population growth that produces ongoing myriad environmental impacts. Plaintiffs accordingly assert that NEPA requires DHS/USCIS to assess the environmental impacts of its actions.

49.     NEPA requires Federal agencies to apply NEPA when undertaking federal actions and making decisions that could have a significant impact on the human environment. CEQ regulation 40 C.F.R. §1508.18(a) provides that federal programs constitute "major federal actions" subject to NEPA compliance. 40 C.F.R.  §1508.18(3) provides that federal actions include: "Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive."

50.     People cause myriad impacts to the environment. Additional people result in additional impacts to the environment. *See* Ex. 6. The primary factor driving future U.S. population growth is international migration. Foreign nationals settling into the U.S. from abroad add directly to the nation's population by their arrival and by the children they have after they come. Because the fertility of American women has been at or below replacement level for many years—2.1 children per women—absent immigration there would be very little long-term population growth in the United States. Ex. 5 at 1. Plaintiffs' demographic expert Dr. Camarota estimates that immigration accounted for about 57 percent of U.S. population growth between 1990 and 2017. *Id*. The most recent Census Bureau projections indicate that the U.S. population will be nearly 85 million larger in 2060 than it otherwise would be if there were no new immigration. *Id*.

51.     USCIS is the component of DHS charged with the mission of visa and citizenship policy. USCIS controls and sets the conditions for the entry into and settlement of foreign nationals in the United States. DHS therefore is the agency that causes most of the population growth of the United States.

52.     It is, therefore, manifest that DHS controls one of the most environmentally significant mandates delegated to any federal agency, and yet DHS fails even to consider any potential environmental impacts of USCIS' entire statutory mission.

53.     DHS has continuously failed to make well-informed decisions; failed to conduct reasoned analyses of potential impacts to the human environment resulting from USCIS's visa and citizenship policy actions; and has failed to engage the public on the range of potential environmental impacts or create public records so that interested or affected members of the public can learn about the environmental implications of USCIS programs. This is notwithstanding that all of these steps are required by both NEPA and the APA.

54.     Despite the enormous impacts to the human environment resulting from USCIS's visa and citizenship policy regulating the entry into and settlement of foreign nationals in the United States, DHS has failed to initiate *any* NEPA review analyzing the impact of such actions. DHS or its predecessor agencies have implemented at least 90 actions since the promulgation of CEQ's 1978 NEPA regulations pursuant to its authority under the nation's immigration laws, specifically the Immigration and Nationality Act, Pub. L. No. 82-414, 66 Stat. 163 (1952), (the "INA").  See Ex. 4 at 1, which specifically identifies and briefly describes these actions. Each of these actions qualify as "major actions" under NEPA. They were created and updated through the ongoing exercise of discretion by USCIS or by the agencies which once carried out its functions, via the adoption of both regulations and policy memoranda. DHS visa and citizenship related actions have resulted and will continue to result in impacts to the human environment, including but not limited to significant ongoing population growth in the United States and unending increases in the population density of numerous localities throughout the United States.

55.     DHS and USCIS have demonstrated the arbitrary and capricious nature of their NEPA compliance though recent inconsistent and post hoc rationalizations. DHS has no guidance in the Instruction Manual for anything related to USCIS's entire mandate, no record support for any exemption from NEPA relating to visa and citizenship policies, and no categorical exclusions related to the entrance and settlement of foreign nationals. There is no evidence in the administrative record of DHS' NEPA procedures that it ever even occurred to anyone in DHS to consider whether the entry and settlement of foreign nationals into the US could have environmental impacts.[10]

56.     However, once the public started to comment on the environmental effects of USCIS' actions, Defendants could no longer entirely ignore the question of whether there should be NEPA review of visa and citizenship related actions. In a final rulemaking on January 17, 2017, DHS responded to public comment that "DHS agrees that NEPA applies to this, as to every, final rulemaking," but insisted a categorical exclusion applied.[11] Later, Defendant came up with another explanation in a rule relating to the H-1 B program published on January 31, 2019. There DHS and USCIS claimed that NEPA doesn't apply to such actions at all. In this regulation, Defendant claimed that it had "analyzed this action and has concluded that NEPA does not apply due to the excessively speculative nature of any effort to conduct an impact analysis."[12] These inconsistent and post-hoc rationalizations are arbitrary and capricious. Instead of conducting any a NEPA analysis on the effects commentators pointed out, Defendant concluded that since the Instruction Manual is silent on the impact of environmental impacts, it must not need to conduct any. This is a clear violation of NEPA.

---

[10] Ex. 6.
[11] 82 Fed. Reg. 5,238, 5,284 (Jan. 17, 2017).
[12] 84 Fed. Reg. 888 (Jan, 31, 2019).

57.     The list of 80 actions below, grouped by type and chronology, promulgated with no environmental analysis, violate NEPA because they have the potential to increase the population of the United States and thus impact the environment (for further information, see Ex. 4):

Refugee Visas

- 46 Fed. Reg. 45118 (Sept. 10, 1981): Initially implementing the Refugee Act of 1980 and setting out refugee procedures.
- 56 Fed. Reg. 26897 (Jun. 12, 1991): Implementing the procedures by which a refugee adjusts status to LPR)
- 57 Fed. Reg. 42883 (Sept. 17, 1992): Amending procedures for filing for LPR status.
- 62 Fed. Reg. 10312 (Mar. 6, 1997): Amending handling of refugee claims.
- 63 Fed. Reg. 3795 (Jan. 27, 1998): Establishing guidelines for the policy governing admitting the family members of refugees.
- 63 Fed. Reg. 30105 (Jun. 3, 1998): Changing procedures for refugees to adjust status to LPR.

Granting of Citizenship

- 47 Fed. Reg. 940 (Jan. 8, 1982): Regulatory language defining subject to the jurisdiction very broadly.

Non-Immigrant Visas

- 52 Fed. Reg. 42590 (Nov. 5, 1987), with minor corrections at 53 Fed. Reg. 9172 (Mar. 21, 1988): Creation of number of various rules for entry, including temporary visitors for business or pleasure, border crossing cards, visas (B-visas, BCC-visas), student visas, temporary workers, spouses and children of certain non-immigrant visa holders, and miscellaneous others.
- 59 Fed. Reg. 41818 (Aug. 15, 1994): Implementing new provisions of several temporary worker program.
- 59 Fed. Reg. 511101 (Oct. 7, 1994): Allowing certain temporary workers to apply to become lawful permanent residents (LPRs).
- 60 Fed. Reg. 44260 (Aug. 25, 1995): Corrected at 60 Fed. Reg. 52248 (Oct. 5, 1995): Adding T-visa.
- 62 Fed. Reg. 10422 (Mar. 7, 1997): Revising h-1, h-2, h-13(ii).
- 62 Fed. Reg. 48138 (Sept. 12, 1997): Revising visa for treaty investor.
- 63 Fed. Reg. 31872 (Jun. 10, 1998): Allowing F-1 students to work.
- 64 Fed. Reg. 29208 (Jun. 1,1999): Revising H-1 and L-1 status during pending application, corrected at 64 Fed. Reg. 30103 (Jun. 4, 1999).
- 64 Fed. Reg. 32146 (Jun. 15, 1999): Extending period of duration of status for F and J nonimmigrants.
- 65 Fed. Reg. 10678 (Feb. 29, 2000): Revising petitions for H-1B, interim.

- 66 Fed. Reg. 31107 (Jun. 11, 2001): Created a new visa category for nurses.
- 66 Fed. Reg. 46697 (Sept. 7, 2001): Adding another V nonimmigrant visa.
- 67 Fed. Reg. 4783 (Jan. 31, 2002): Implementing new classification for trafficking victims.
- 67 Fed. Reg. 18062 (Apr. 12, 2002): Requiring change of status from B to F before taking course of study.
- 67 Fed. Reg. 54941 (Aug. 27, 2002): Reducing required course load for F and M students near border.
- 70 Fed. Reg. 23775 (May 5, 2005): Allocating additional H-1B visas under 2004 H-1B Visa Reform Act.
- 72 Fed. Reg. 18856 (Apr. 16, 2007): Changing petitioning requirements for O and P visas.
- 72 Fed. Reg. 19100 (Apr. 17, 2007): Giving more flexibility to USCIS in processing applications.
- 73 Fed. Reg. 53014 (Sept. 17, 2007): Establishing the requirements and procedures for seeking U visa status; updated further by 73 Fed. Reg. 75560 (Dec. 12, 2008)
- 73 Fed. Reg. 15389 (Mar. 24, 2008): Clarifying treatment of H-1B workers subject to numerical limitations.
- 73 Fed. Reg. 61332 (Oct. 16, 2008): Extending TN visas.
- 73 Fed. Reg. 18944, April 8, corrected at 74 Fed. Reg. 26514 (Jun. 3, 2009): Extending period graduated students can stay in the country while working in the OPT program.
- 73 Fed. Reg. 55683 (Sept. 26, 2008): Adjusting Student and Exchange Visitor Program fees.
- 73 Fed. Reg. 75540 (Dec. 12, 2008): Allowing T or U visa holders to apply for permanent resident status.
- 73 Fed. Reg. 76891 (Dec. 18, 2008): Removing certain limitation on H-2A employers.
- 75 Fed. Reg. 47699 (Aug. 9 2010): Granting work authorization for dependents of foreign officials.
- 77 Fed. Reg. 8119 (Feb. 14, 2012): Extending validity of L visas by DOS beyond that set by DHS.
- 77 Fed. Reg. 76353 (Dec. 28, 2012): Making corrections to H-2A petitions, rules.
- 78 Fed. Reg. 24047 (Apr. 24, 2013): Making interim rule, with the Department of labor, changing methodology of H-2B petitions.
- 78 Fed. Reg. 58867 (Sept. 25, 2013): Issuing notification of numerical limitation for Northern Mariana Islands for FY 2014.
- 78 Fed. Reg. 68992 (Nov. 13, 2013): Creation of T visa for those approved by DHS.
- 74 Fed. Reg. 61517 (Nov. 25, 2013): Implementing the S-visa classifications (DHS created the program).
- 79 Fed. Reg.  58241 (Sept. 29, 2014): Setting numerical limitations on CW-1 workers in Northern Mariana Islands.
- 80 Fed. Reg. 10284 (Feb. 25, 2015): Allowing H-4 dependent spouses to have work permits.

- 80 Fed. Reg. 24145 (Apr. 29, 2015): Implementing wage methodology for H-2B program.
- 80 Fed. Reg. 63911 (Oct. 10, 2015): Setting numerical limitation of CW-1 workers in Northern Mariana Islands.
- 81 Fed. Reg. 2068, January 15, 2016 (loosening employer rules for H-1B1, CW, and EB visas)
- 81 Fed. Reg. 60581 (Sept. 2, 2016): Setting numerical limitation of CW-1 workers in Northern Mariana Islands.
- 81 Fed. Reg. 82398 (Nov. 18, 2016): Increasing flexibility in worker programs.
- 81 Fed. Reg. 92266 (Dec. 19, 2017): Changing regulations governing T visas.
- 82 Fed. Reg. 32987 (Jul. 19, 2017): Increasing H-2B agricultural workers.
- 83 Fed. Reg. 24905 (May 31, 2018): Increasing agricultural workers.
- 84 Fed. Reg. 888 (Apr. 1, 2019): Changing H-1B program, filing petitions)

Entrance without Visas

- 54 Fed. Reg. 24901 (Jun. 30, 1988): Creation of the Visa Waiver Program

  o 73 Fed. Reg. 67711 (Nov. 17, 2008): Addition of countries to the Visa Waiver Program: Czech Republic, Estonia, Hungary, Latvia, Lithuania, the Republic of Korea, and the Slovak Republic

  o 73 Fed. Reg. 79595 (Dec. 30, 2008): Addition of Malta to the Visa Waiver Program

  o 77 Fed. Reg. 64409 (Oct. 22, 2012): Addition of Taiwan to the Visa Waiver Program

  o 79 Fed. Reg. 17852 (Mar. 31, 2014): Addition of Chile to the Visa Waiver Program

Employment Immigrant Visas

- 56 Fed. Reg. 60897 (Nov. 29, 1991): Creation of employment visa program.
- 58 Fed. Reg. 44606 (Aug. 24, 1993): Creation of a pilot investor program.
- 71 Fed. Reg. 19805, (Apr. 18, 2006): Rules for special alien broadcasters.
- 81 Fed. Reg. 2068 (Jan. 15, 2016): Allowing increased work authorizations.
- 81 Fed. Reg. 82398 (Nov. 18, 2016): Increased benefits for certain work based visa holders.

Family Immigrant Visas

- 57 Fed. Reg. 41053 (Sept. 9, 1992): Expanding family members eligible for immigration benefits.
- 60 Fed. Reg. 38947 (Jul. 31, 1995): Clarifying the process of adjusting status.
- 61 Fed. Reg. 13061 (Mar. 26, 1996): Creating a process for victimized relatives.
- 71 Fed. Reg. 35732 (Jun. 21, 2006): Creating an easier process for sponsoring family members.
- 72 Fed. Reg. 19100 (Apr. 17, 2007): Making it easier to grant immigration benefits.
- 76 Fed. Reg. 28303 (May 17, 2011): Allowing certain petitioners to file abroad.

Student and Exchange Visitor Program

- 58 Fed. Reg. 15196 (Mar. 19, 1993): Implementation of overhaul of the exchange visitor program.
- 67 Fed. Reg. 60107 (Sept. 25, 2002): Initial implementation overall of (still operating) Student and Exchange Visitor Program (SEVP) visa program. Further revisions by DOS including:
    - 67 Fed. Reg. 76256 (Dec. 11, 2002): Changing retention and reporting for SEVP
    - 69 Fed. Reg. 39814, July 1, 2004: Authorizing fee collection for SEVP)
- 70 Fed. Reg. 96 (May 19, 2005): extending stay for professors and researchers (coordinated with DHS).
- 71 Fed. Reg. 33237 (Jun 8, 2006): au pair program expanded.
- 72 Fed. Reg. 33669 (Jul. 2007): Expanding Trainee and intern program.
- 73 Fed. Reg. 34861 (Jun. 19, 2008): au pair program expanded.
- 73 Fed. Reg. 55683 (Sept. 26, 2008): Adjusting program fees, recertification of schools.
- 75 Fed. Reg. 48555 (Aug. 11, 2010): expanding the trainee and intern program.
- 75 Fed. Reg. 65975 (Oct. 27, 2010): revising secondary school rules for exchange program.
- 76 Fed. Reg. 23177 (April 26, 2011): Amending summer work travel program.
- 80 Fed. Reg. 23680 (Apr. 29, 2015): Expanding the Student Exchange Visitor program.
- 81 Fed. Reg. 4945 (Jan. 29, 2016): Amending Teacher category in exchange program.
- 81 Fed. Reg. 13040 (Mar. 11, 2016): Expanding time F-1 visa holders can stay and work in the country after graduation in the "OPT program."

58.     DHS's NEPA procedures arbitrarily provide no framework to analyze any of the environmental effects of the actions listed in the previous paragraph. As a result, most of these regulations were implemented with no reference to NEPA analysis. Only a small number of these actions cite categorical exclusions, and none of the categorical exclusions cited include scoping that addressed potential effects on population.

59.     One can only conclude—as the Plaintiffs in this case have—that DHS, with its outsized influence on our nation's population growth and, ipso facto, upon our nation's environmental health, has acted and continues to act in a manner that is arbitrary and capricious with respect to its NEPA obligations.

60.     The result of these actions is massive, federally induced, population growth. Furthermore, when foreign nationals enter the United States, the resulting population growth is not merely limited to those individuals who enter the country and the children they will have. Foreign nationals who ultimately become lawful permanent residents ("LPRs") can themselves sponsor further immigration to the country via what is known as "chain migration." One prominent team of researchers has calculated a chain migration "multiplier."  This multiplier is based on data on family-sponsored immigration for the period 1996-2000. According to this research, every 100 original immigrants to the United States during this period sponsored another 345 family members as immigrants. See further discussion in Ex. 4.

61.     The listed growth inducing major actions are described and analyzed in Ex. 4 by expert Jessica Vaughan's affidavit. Ms. Vaughan identifies 80 of the specific, discrete instances where DHS has undertaken regulatory action, which together have had a massive environmental impact but which the DHS NEPA procedures provide no framework for analysis. These growth-inducing impacts are felt not just at a national but at a local level, for there are many areas of the country that have been particularly attractive to foreign nationals settling in the United States.

62.     Like INS before it, DHS and its component agencies do consider whether the environmental impacts of its facilities such as detention centers are significant.[13]  DHS apparently believes that the detention of an increased number of foreign nationals may require the building of more housing if enough foreign nationals are detained—which has the potential of causing environmental impacts. However, foreign nationals entering the U.S. do not only have

---

[13] See, e.g., Department of Homeland Security Finding of No Significant Impact for Actions to Address An Increased Influx of Unaccompanied Alien Children and Family Units Across the Southwest Border of the United States, Aug. 14, 2014, available at https://www.dhs.gov/sites/default/files/publications/FONSI_UAC%26FamUnits_20140812.pdf

an environmental footprint while in DHS custody. Settled inhabitants outside of the custody of

DHS also have housing needs, as well as every other kind of need any resident of a country has.

For the year of 2019, the last year on record and one that was particularly large, the average daily

detained population as calculated by ICE was over 50,000.[14]   In 2019, the foreign born

population was 46.6 million. Ex. 4 at 3. It is arbitrary and capricious for DHS to promulgate

NEPA procedures that at least consider whether the impacts of facilities for 50,000 people are

significant, but completely ignore the impacts of tens of millions of people that include facilities

but so much more.

**Environmental Impacts Resulting from Visa and Citizenship Policies**

63.     Upon information and belief, 46.6 million foreign nationals have entered and settled in

the United States as a result of actions by DHS and its predecessor agency INS since NEPA was

passed. Furthermore, millions of foreign nationals will continue to enter and settle in the United

States, yet these foreseeable impacts remain unanalyzed by any DHS despite obligations under

NEPA. In some cases, DHS's very failure to provide public transparency and analysis regarding

the numbers of foreign nationals subject to and benefiting from its action has disadvantaged

Plaintiffs in their quest to establish the true magnitude of environmental impacts.  DHS's

compliance with NEPA would remedy this lack of transparency.

64.     Visa and citizenship policy has a significant effect on the size and growth of the United

States population, as well as the particular distribution which that population growth takes.

Population growth itself is a significant environmental impact, as particularly noted by Congress

in NEPA. Dr. Cafaro's report, "The Environmental Impact of Immigration into the United

---

[14] U.S. Immigration and Customs Enforcement, Fiscal Year 2019 Enforcement and Removal
Operations Report at 5. Available at
https://www.ice.gov/sites/default/files/documents/Document/2019/eroReportFY2019.pdf.

States," provides an overview of how population growth, as driven by immigration, yields a host of harmful environmental impacts.  See Ex. 6.  As noted by Dr. Cafaro, population growth is a key factor in a wide variety of environmental impacts. For example, immigration-driven population growth leads to urban sprawl and farmland loss; habitat and biodiversity loss; an increase in worldwide levels of greenhouse gas emissions; and an increase of water demands and water withdrawals from natural systems. See Ex. 5 at 1.

65.     By surveying the "purposes and needs" sections of several recent federal and state agency EISs, Dr. Cafaro explains how new, environmentally harmful projects are continually created around the country to accommodate immigration-driven population growth. See Ex. 5 at 17. These recent EISs cite anticipated or planned population growth as creating the need for a wide range of environmentally harmful new infrastructure, for example, transit projects, such as the creation of light rail systems, new airports, and projects for road-widening and road construction: energy projects, such as coal and natural gas development, new power plants, and pipelines, along with water supply projects, such as new dams and reservoirs. See Ex. 5 at 17-23. There are many other kinds of developments, such as new schools and housing projects, that are only needed because of population growth. See Ex. 5 at 22-23.

66.     Population growth is responsible for one of the leading environmental problems across the United States: urban sprawl, that is, new development on the fringes of existing urban and suburban areas. See Ex. 5 at 24-33. Sprawl increases overall energy and water consumption and air and water pollution, and decreases open space and natural wildlife habitat, endangering the survival of many species. *Id*.  From 1982 to 2010, a period of massive immigration, 41.4 million acres of previously undeveloped urban land was built on to accommodate the United States' growing cities and towns—an area approximately equivalent to the State of Florida. *Id*.

67.     The future loss of the undeveloped land remaining in the United States, due to unrelenting population growth, will continue to produce significant harmful environmental consequences. The ongoing loss of open spaces, habitats, and wilderness to unrelenting population growth is a source of anguish to those who love the wilderness, including the Plaintiffs. Former President Barack Obama acknowledged this great environmental loss in his speech marking the designation and preservation from development of the Papahānaumokuākea Marine National Monument in Hawaii. President Obama, who supported a platform of immigration expansion during his presidency, at the same time, mourned the environmental losses within the United States that would be caused by the population growth he supported. In 2016, he stated, "I look forward to knowing that 20 years from now, 40 years from now, 100 years from now, this is a place where people can still come to and see what a place like this looks like when it's not overcrowded or destroyed by human populations." White House Press Release, Remarks by the President at the Designation of the Papahānaumokuākea Marine National Monument (September 1, 2016), available at https://obamawhitehouse.archives.gov/the-press-office/2016/09/01/remarks-president-designation-papahanaumokuakea-marine-national-monument. NEPA was created precisely so that leaders in government would not be unaware of the environmental damages of their own policies.

68.     Population growth also threatens to accelerate biodiversity loss and the extinction of animal and plant species. See Ex. 5 at 41. The United Nations Secretariat of the Convention on Biological Diversity estimates that humanity may be causing the extinction of one out of every three species on Earth in the next one to two hundred years. Id. Conservation biologists agree that the most important "direct drivers" of biodiversity loss are: habitat loss, the impacts of alien species, over-exploitation, pollution, and global climate change. Id. at 42. All five are caused by

increased human population and the increased human activities associated with human population growth. Id.

69.     The carbon dioxide ("CO2") emissions produced in the United States also are increasing because of immigration-driven population growth. Furthermore, those foreign nationals that settle in the United States produce an estimated four times more CO2 in the United States than they would have in their countries of origin. The estimated 637 tons of CO2 produced annually by U.S. immigrants is 482 million tons more than they would have produced had they remained in their home countries.  The impact of immigration to the United States on global emissions is equal to approximately 5 percent of the increase in annual world-wide CO2 emissions since 1980. That is 5 percent of total global CO2 emissions, not 5 percent of U.S. emissions. These numbers do not even include the CO2 impacts of children born to United States immigrants. See Ex. 5. at 66-67.

70.     Because a greater population uses more water, population growth also results in a higher aggregate water use. This higher aggregate use puts increased pressure on water systems, including rivers and underground aquifers. Water taken for human consumption is necessarily removed from an ecosystem, leading to a cascade of harmful environmental impacts. *Id*. at 75-79. "When too much water is taken from these ecosystems for consumptive use by human beings, there may not be enough water left behind to perform these critical ecosystem services and functions." *Id*. at 79.

71.     As detailed by Dr. Cafaro, the impacts of the mass entry and settlement of foreign nationals are deep and profound. Yet DHS, the very agency responsible for regulating all policies related to entry and settlement has promulgated NEPA procedures devoid of any framework for accounting for any of it.

## CAUSES OF ACTION

### COUNT I

*The DHS Instruction Manual Violates the APA and NEPA by Failing to Require NEPA Compliance with Respect to its Actions Relating to the Entry Into and Settlement of Foreign Nationals in the United States.*

72.      Plaintiffs reallege the above paragraphs as if fully set forth herein.

73.      DHS promulgated its current NEPA procedures under CEQ regulations requiring each federal agency to adopt internal NEPA procedures to ensure NEPA compliance. 40 C.F.R. § 1507.3.  These agency NEPA procedures needed to comply with CEQ regulations. 40 C.F.R. § 1507.1 (2017).

74.      CEQ's previous regulation 40 C.F.R. § 1507.3(b)(2) requires DHS to set forth "specific criteria for and identification of those typical classes of action[]" which normally require (i) the preparation of an environmental impact statement, (ii) the finding that they are subject to categorical exclusion, or (iii) the preparation of an environmental assessment.

75.      DHS promulgated its current Instruction Manual on November 6, 2014.  (Ex. 2)

76.      The Instruction Manual qualifies as a "rule" under the APA because it is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4) (2012). NEPA rules qualify as final federal actions under the APA. 40 C.F.R. §1508.18(a) provides that federal actions include "new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals[.]"

77.      The regulation of the entry into and settlement of foreign nationals in the United States is a major component of DHS's statutory mission, and such regulation comprised "principal

programs" pursuant to 40 C.F.R. § 1505.1(b) and "typical classes of action" pursuant to 40

C.F.R. § 1507.3(b)(2).

78.     The entry into and settlement of foreign nationals in the United States has myriad impacts

on the "human environment" subject to NEPA analysis, including, but not limited to, population

growth and the attendant impacts such growth produces. 42 U.S.C. § 4331(c)(C ).

79.     The Instruction Manual, which is a final agency action with legal consequences, omits

any mention of that vast class of USCIS actions implementing visa and citizenship policy. The

Instruction Manual omits any analysis specific to USCIS at all, even though USCIS' specific

mission must be analyzed.

80.     DHS's failure to address these "typical classes of actions" and/or "principal programs" in

its Instruction Manual violated the CEQ NEPA regulations 40 C.F.R §§ 1500-1508.

81.     The recently promulgated CEQ regulation requires that DHS promulgated new NEPA

procedures by September 14, 2021. 40 CFR 1500 *et seq*.

82.     The previous failure of DHS to incorporate NEPA compliance into its Instruction Manual

for those actions relating to the entry into and settlement of foreign nationals or to visa and

citizenship policy in the United States violates the CEQ regulations, and accordingly is arbitrary,

capricious, an abuse of discretion, and otherwise contrary to law, in violation of the APA.

83.     Failure to consider the environmental impacts of USCIS' visa and citizenship programs

when DHS next adopts new NEPA procedures would also constitute a violation of NEPA and

the APA.

<u>COUNT II</u>

*DHS and USCIS are in continuing violation of the APA and NEPA for failing to conduct NEPA review for at least 80 ongoing actions.*

84.     Plaintiffs reallege the above paragraphs as if fully set forth herein.

35

85.     CEQ regulation 40 C.F.R. § 1508.1(q)(3)(iii) provides that federal actions subject to NEPA include: "Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive."

86.     DHS's decision to proceed without initiating any NEPA compliance for any of these visa related regulations is contrary to NEPA and the CEQ regulations and accordingly is arbitrary, capricious, an abuse of discretion, and otherwise contrary to law, in violation of the APA.

## PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing, Plaintiffs respectfully request that this Court grant the following relief:

A.  Enter a declaratory judgment that DHS's failure to address any of USCIS's mission in its NEPA procedures is arbitrary and capricious and in violation of its duties under the law both at the time DHS promulgated its NEPA procedures and under the law today;

B.  Enter a declaratory judgment that DHS shall promulgate a component procedure for USCIS that provides guidance for the analysis of the environmental impacts of its visa and citizenship programs;

C.  Enter a preliminary injunction preventing DHS from promulgating new NEPA procedures that fail to address the environmental impacts of USCIS's visa and citizenship policies;

D.  Award Plaintiffs reasonable attorney fees, costs and expenses incurred in pursuing this action to the extent permitted by law; and

E.  Provide such other relief as this Court deems just and proper.

Respectfully submitted,

Dated: November 24, 2020

/s/ Charles R. Shreffler
**SHREFFLER LAW LTD.**
Charles R. Shreffler (#183295)
816 Dodd Road, Ste A
West St. Paul, MN 55118
chuck@chucklaw.com
T: (612) 872-8000

/s/ Lesley Blackner
**CENTER FOR IMMIGRATION STUDIES**
Lesley Blackner (Florida Bar # 654043)*
Legal Fellow
1629 K Street N.W., Suite 600
Washington, DC  20006
lesleyblackner@gmail.com
T: (561) 818-6621

*Attorneys for Plaintiffs*

**Pro hac vice application forthcoming*